| | |
|---|---|
| Denver District Court<br>1437 Bannock St., #256<br>Denver, CO 80202 | EFILED Document<br>CO Denver County District Court 2nd JD<br>Filing Date: Aug 19 2009  4:03PM MDT<br>Filing ID: 26680524<br>Review Clerk: Stacy Shaul |

NATHAN ACKS;
TIFFANY BRAY;
CHASE GOLL;
ELI HARDY;
AMINAH MASUD;
IAN MORRISON;
BLAKE PENDERGRASS;
KIM SIDWELL

    Plaintiffs,

v.

CITY AND COUNTY OF DENVER;
DEBORAH DILLEY, a Commander with the Denver Police
Department, in her individual capacity;
JOHN DOE, whose true name is currently unknown, in his individual
capacity;
ANTHONY FOSTER, a Sergeant with the Denver Police
Department, in his individual capacity; and
ANTHONY MARTINEZ, a Sergeant with the Denver Police
Department, in his individual capacity;

    Defendants.

**Case Number:**

**Div.:**    **Ctrm:**

_Attorneys for Plaintiff_

John A. Culver, Esq., #21811
Seth J. Benezra, Esq., #13144
Benezra & Culver, L.L.C.
274 Union Blvd., #220
Lakewood, CO  80228-1835
(303) 716-0254
(303) 716-0327 facsimile
jaculver@bc-law.com

Lonn M. Heymann, Esq., #34793
Rosenthal & Heymann, L.L.C.
1020 W. 7th Avenue
Denver, CO  80204
(303) 825-2223
lonn@rosehey.com

Mark Silverstein, Esq., #26979
Taylor S. Pendergrass, Esq., #36008
ACLU Foundation of Colorado
400 Corona Street
Denver, CO  80218
(303) 777-5482
msilver2@att.net

## COMPLAINT AND JURY DEMAND

**EXHIBIT**

*A*

tabbies®

## I. INTRODUCTION

1.     On the evening of August 25, 2009, during the Democratic National Convention, a solid line of riot-equipped police shut down a protest march as it proceeded on 15th Street and the adjoining sidewalks in downtown Denver.  A second line of police quickly closed in from behind, confining hundreds of persons in a one-block stretch of 15th Street between Court and Cleveland.

2.     The encircled group included participants who had been walking legally on the public sidewalks as well as persons who had been marching in the street without the required permit.  It also included legal observers, curious onlookers, members of the press, and other nonparticipants.

3.     Denver then carried out an arbitrary and groundless mass arrest, without probable cause, of 96 individuals, including the Plaintiffs in this case.   Arrestees were locked into holding cells at a Denver warehouse that had been converted into a detention facility for DNC-related arrests.   At that detention facility, Denver refused to allow attorneys to meet with or speak with any of the arrestees.

4.     The Plaintiffs were falsely arrested and forced to defend themselves in court proceedings from groundless accusations of criminal conduct.  They were charged with failing to obey a police order to disperse.  After Denver eventually acknowledged that no such order had ever been issued, Denver nevertheless persisted in prosecuting the Plaintiffs for "obstruction" of a public right of way by allegedly marching in the street without a permit.

5.     Now that the criminal cases have all been resolved in Plaintiffs' favor, they file this action seeking compensation for the violation of their constitutional and statutory rights.  Pursuant to the federal civil rights statute, 43 U.S.C. § 1983, the eight individual Plaintiffs seek compensatory and punitive damages for violation of their rights under the First and Fourth Amendments.    Pursuant to a Colorado statute that requires jailers to allow arrestees to meet with attorneys, C.R.S. § 16-3-404, Plaintiffs seek statutory penalties on behalf of themselves and others who were ensnared in the mass arrest on 15th Street and detained at Denver's detention facility without access to counsel.

## II. JURISDICTION AND VENUE

6.     This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, and the laws of the State of Colorado.  This Court has jurisdiction over the subject matter of this action pursuant to Article XI, § 9 of the Colorado Constitution.  The amount in controversy in this case exceeds $10,000.

7.     Venue is proper in this Court pursuant to Colo.R.Civ.P. 98(c) because Defendants reside within Denver County.

8.     Plaintiffs have complied with the jurisdictional prerequisites of this lawsuit, including through the filing of a timely class-based notice of intent to sue under the Colorado Governmental Immunity Act.

## III.  PARTIES

### A.    Plaintiffs.

9.     At all times relevant to this complaint, Nathan Acks was 28 years old and lived and worked in Denver.   He was also a graduate student at the University of Colorado at Denver completing his master's degree in applied mathematics.   On August 25, 2008, Mr. Acks was volunteering as a trained legal observer for the People's Law Project, witnessing and recording the actions of Denver's officers during the Democratic National Convention ("DNC"), when he was wrongfully arrested and imprisoned.

10.     At all times relevant to this complaint, Tiffany Bray was 20 years old and lived and worked in Denver.  On August 25, 2008, she was observing a march and the actions of Denver's officers when she was wrongfully arrested and imprisoned.

11.     At all times relevant to this complaint, Chase Goll was 22 years old and lived and worked in Denver.  He was also a student at the Art Institute of Colorado in Denver majoring in photography.  On August 25, 2008, Mr. Goll was taking photographs for a final class project related to the DNC when he was wrongfully arrested and imprisoned.

12.     At all times relevant to this complaint, Eli Hardy was 33 years old and lived and worked in Denver. He was also a student at the Art Institute of Colorado in Denver majoring in photography.  On August 25, 2008, Mr. Hardy was accompanying Mr. Goll to serve as a photography model for Mr. Goll's final class project and to observe the events during the DNC, when he was wrongfully arrested and imprisoned.

13.     At all times relevant to this complaint, Aminah Masud was 20 years old and lived and worked in Denver.  On August 25, 2008, she was observing a march and the actions of Denver's officers when she was wrongfully arrested and imprisoned.

14.     At all times relevant to this complaint, Ian Morrison was 20 years old and lived in Aurora.  He also attended the Colorado Film School in Denver.  On August 25, 2008, he was videotaping a march and the actions Denver's officers for a documentary film when he was wrongfully arrested and imprisoned.

15.     At all times relevant to this complaint, Blake Pendergrass was 29 years old and lived and worked in Denver.  On August 25, 2008, he was observing a march and the actions of Denver's officers when he was wrongfully arrested and imprisoned.

16.     At all times relevant to this complaint, Kim Sidwell was 26 years old and lived in Denver.  She was also a student at the Art Institute of Colorado.  On August 25, 2008, she was observing and photographing a march and the actions of Denver's officers when she was wrongfully arrested and imprisoned.

**B.     Defendants.**

17.     Defendant Denver is a home rule municipality pursuant to Article XX of the Colorado Constitution.  It operates the Denver Police Department ("DPD") and the Denver Sheriff Department ("DSD").  At all times relevant to this complaint, Defendant operated a detention facility it called the Temporary Arrestee Processing Site or "TAPS," which was used for the custody of persons arrested in Denver during the DNC.  The TAPS facility was staffed by Denver employees.  DPD and DSD officers, including Defendants Dilley, Doe, Foster and Martinez, are Denver's employees and agents. During the DNC, Denver contracted with other jurisdictions to provide law enforcement officers during the DNC.  At all time periods relevant to this Complaint, officers of other jurisdictions operating in Denver during the DNC were Denver's agents and are included in any reference to "Denver's officers."

18.     At all times relevant to this Complaint, Defendant Deborah Dilley was a DPD commander.   Plaintiffs sue Defendant Dilley in her individual capacity.

19.     At all times relevant to this Complaint, Defendant Doe was a Denver a DPD or DSD supervisor or officer or an employee of the Manager of Safety.  Defendant Doe may be more than one person, and/or may be one or more of the named defendants.  Plaintiffs will amend the complaint to reflect Defendant Doe's true name or names upon further discovery.   Plaintiffs sue Defendant Doe in his/her individual capacity.

20.     At all times relevant to this Complaint, Defendant Anthony Foster was a DPD sergeant.  Plaintiffs sue Defendant Foster in his individual capacity.

21.     At all times relevant to this Complaint, Defendant Anthony Martinez was a DPD sergeant.  Plaintiffs sue Defendant Martinez in his individual capacity.

22.     At all times relevant to this complaint, the individual Defendants were acting under color of state law and pursuant to Denver's policies, procedures, customs and practices.

4

## IV.  CLASS ALLEGATIONS

23.     On behalf of themselves and others, Plaintiffs challenge the legality of Defendant City and County of Denver's decision to deny all individuals in custody at the TAPS facility their right to consult with an attorney.  Plaintiffs seek a declaration that Defendant violated C.R.S. § 16-3-404 and seek statutory penalties for themselves and the class.

24.     This Complaint meets the predicate requirements for class certification of Colo.R.Civ.P. 23(a) in that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

25.     Certification of a class seeking declaratory and injunctive relief regarding Defendant's practices is appropriate under Colo.R.Civ.P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

26.     Certification under Colo.R.Civ.P. 23(b)(3) is also appropriate because questions of law and fact common to class members predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## V.  FACTUAL ALLEGATIONS

### A.     Denver and Its Officers Caused Plaintiffs' Wrongful Arrest.

#### 1.     The events at Civic Center Park on August 25, 2008.

27.     Civic Center Park is Denver's oldest and most centrally-located public park in downtown Denver.  The park is situated in the middle of Denver's major public transit centers, Denver's business and shopping district on the 16th Street Mall, the Colorado State Capitol Building, Denver's City and County Building, Denver's public library, the Colorado Supreme Court, Denver's art museum, and dozens of other office buildings and residences.

28.     During the DNC, Civic Center Park was a hub of activity.  People utilized the park for a variety of planned events, such as speeches, trainings, teach-ins, serving free food, and musical concerts.  The park was also used during the DNC as a public gathering place and as a place to rest and relax.

29.     On Monday, August 25th, 2008, numerous events were planned at Civic Center Park.  A "music showcase" from 3 p.m. to 10 p.m. was advertised featuring musicians, poets and speakers.  Free food and drink were being served to hundreds of people.  Several teach-ins were planned for the late afternoon.  A demonstration at the U.S. Mint was planned for 5 p.m., with participants leaving from and returning to Civic Center Park.  A group calling itself Unconventional Action advertised a march to begin at 6 p.m. from Civic Center Park.

30.     On the afternoon and early evening of August 25, 2008, these various events drew thousands of people to Civic Center Park.  These events drew participants, as well as spectators, curious onlookers and others.  These events also drew dozens of members of the international, national, local and independent press, and informal documentarians and observers interested in recording the historic events in downtown Denver during the national convention.

**2.      Denver's time, place and manner restrictions for marches.**

31.     Denver's city streets are traditional public forums.  In some cases, Denver imposes time, place and manner restrictions on the use of public streets for expressive activity by requiring a permit for a march in city streets.

32.     In practice, however, Denver has waived this requirement and allowed certain marches to occur in city streets when no permit has been obtained.

33.     Pursuant to Denver's unwritten practice of waiving the permit requirement for certain marches, law enforcement officers will close down the street to vehicles in order to allow the unpermitted march to proceed safely in the streets.

34.     For example, in the spring of 2006, tens of thousands of people marched in Denver's streets to express their opinions on immigration policies.  Denver did not make any arrests, despite the fact that there was no permit.

35.     Denver also waived the permit requirement during the DNC.  For example, on August 27, 2008, Denver's law enforcement officers closed major downtown thoroughfares to allow a march by a group called Iraqi Veterans Against the War.  Denver's officers did not arrest persons marching in the street, even though they did not have a permit.

36.     Just hours before the march that is the subject of this Complaint, a group of individuals marched on the streets and on the sidewalks from Civic Center Park to the U.S. Mint without a permit.  Denver's officers allowed to march proceed without making any arrests.

37.    Though Denver requires a written permit for street marches, Denver has no such requirement for marches that occur on public sidewalks.  Prior to the DNC, Denver widely advertised that no permit was required to march on Denver's public sidewalks.

### 3.    The March from Civic Center Park onto 15th Street.



Figure 1.0:   Map of area

38.    Shortly after 7 p.m. on August 25, 2008, a march began in Civic Center Park.  The marchers left Civic Center Park from the Greek Amphitheatre and marched down 15th Street toward Court Place.  The marchers did not have a permit.  Some of the marchers were in the street; others marched only on the sidewalks.

39.    As the march began, it was followed by members of the media documenting the event, as well as informal documentarians, legal observers, curious onlookers, and others.  People nearby also included bystanders, such as persons working, staying or commuting downtown, who merely happened to be in the area when the march began.

40.    Defendants had various options for managing the march once it began. For example:

a.  Denver could have waived the permit requirement and allowed the march to continue, as Denver had done in the past with other marches, and made arrests only if and when a particular individual attempted some illegal act other than marching;

b.  Denver could have directed its officers to encircle and detain only those persons who were marching in the street, while allowing those on the sidewalks to continue marching and/or observing from the sidewalks where no permit was required;

c.  Denver could have broadcast an order instructing everyone marching in the street to move onto the sidewalks or face arrest;

d.  Denver could have broadcast a dispersal order instructing everyone in the area, including those lawfully on the sidewalks, to leave the area immediately or face arrest.

41.    Instead, however, Denver elected to trap and detain the entire crowd of hundreds of persons, including those who had never marched in the street.

**4.    Denver encircles and detains hundreds, including those on the sidewalks.**

42.    The march proceeded toward Court Place.  As marchers, media, curious onlookers and others neared Court Place, their path was blocked by a solid line of Denver's officers that extended across 15th Street, blocking passage on the sidewalks as well as the street.

43.    Another group of officers quickly swept in from the southeast and formed another police line behind those nearing Court Place.

44.    More officers arrived quickly.  Within a matter of minutes, officers had formed two roughly parallel police lines, each of which extended from the Wellington Webb Building, across 15th Street, to the Sheraton Hotel.

45.    Hundreds of persons were detained between these police lines, and they were not free to leave.  For purposes of the Fourth Amendment, Denver had seized all of these individuals.



Figure 2.0:  Representation of persons detained in initial police lines

46.     The hundreds of individuals detained between these two police lines included persons who were marching in the street, persons who were marching on the sidewalks, members of the media, documentarians, observers, curious onlookers, and others.

47.     Prior to the seizure, no Denver officer had told persons on the sidewalks they could not lawfully continue to march, observe, or simply be present on the sidewalk.

48.     Although individuals were not permitted to exit the police lines, they were free to move between the street and the sidewalks inside of the police lines.

49.     Persons who had not previously been marching in the street quickly became intermixed with those who had, as people moved around inside of police lines. Within a short amount of time, it was often not possible to distinguish those persons who had previously been marching in the street from everyone else who Denver had seized.

50.     For example, people previously standing only on the sidewalk walked into the street to ask officers for permission to leave, or to look for a place exit police lines.

51.     In addition, members of the press and observers detained inside of the cordon moved from the sidewalks into the street to document and record the events unfolding inside of police lines.

52.     Denver's own officers ordered individuals to move from the sidewalk onto the street. Denver's officers also physically forced individuals off of the sidewalk onto the street with their batons and hands, or by advancing police lines pushing groups off the sidewalk and into the street.

53.     Denver's officers also deployed projectile weapons and OC (pepper) spray into the crowd, often without any prior warning, causing people to move haphazardly in various directions inside of the police lines to avoid being subjected to use of those weapons. For example, Denver's officers deployed torrents of OC spray haphazardly into the crowd to assist uniformed officers in removing from the detained group an undercover officer, who was posing as a protestor. This caused people to move in all directions inside of the police lines.

54.     After the initial seizure, Denver's officers formed additional police lines and gradually constricted and redefined the area in which the seized group was being held.

55.     The Plaintiffs never participated in the march in the street. They were present at the scene of the march for a variety of reasons. Plaintiff Acks was a trained legal observer for the People's Law Project of the National Lawyers Guild, documenting and recording events. Plaintiff Morrison was a credentialed member of the press shooting video for a documentary film. Plaintiffs Goll and Sidwell were photography students taking pictures. Plaintiff Hardy was assisting Plaintiff Goll with his photography project. Plaintiffs Bray, Pendergrass and Masud were merely curious onlookers observing public events unfolding during the DNC.

56.     Prior to being seized by Denver's officers, the Plaintiffs were never ordered to leave the sidewalks or to disperse from the area, and they were never given any opportunity to voluntarily exit the police lines after their seizure.

57.     Plaintiff Bray was standing on the sidewalk when she was seized. She was still standing on the sidewalk when an officer put his baton against her back and shoved her toward the street. The officers formed a line parallel with the back edge of the sidewalk and advanced toward the street, forcing everyone off the sidewalk and into 15th Street, including Plaintiff Bray.

58.     Likewise, Plaintiffs Goll and Hardy were standing on the sidewalk when Denver encircled and detained the entire crowd. They were both on the sidewalk when Denver's officers physically forced them into the street.

59.     Plaintiffs Acks, Masud, Morrison, Pendergrass and Sidwell were likewise all standing on the sidewalk when they were initially seized by Denver's officers. Plaintiff Acks was ultimately ordered by officers to sit down in the street. Plaintiff Masud was pushed by an officer off of the sidewalk and into the street. Plaintiffs Morrison and

Sidwell were forced off the sidewalk by a line of officers advancing toward the sidewalk and ordering everyone to "move back."

### 5. Officers subdivide the seized group and make a mass arrest of a group containing nearly one hundred individuals.

60.    Denver's officers arbitrarily divided the single large crowd into smaller groups.  Ultimately, two distinguishable groups of individuals were detained -- one group next to the Wellington Webb building, and another next to the Sheraton Hotel.

61.    At the time that officers divided the group into two, there was no way to determine which persons had previously been marching in the street, and which persons, like the Plaintiffs, had not been marching in the street.

62.    The group detained near the Sheraton Hotel was initially told that they were going to be released.  Denver's officers, including Defendant Martinez, ordered everyone to get out "ID" and to hold it up.  He announced that everyone would be released one-by-one through a designated exit in the police line.  Almost immediately after this instruction, however, the order was reversed and everyone was ordered to sit back down.

63.    Defendant Martinez was in control of officers who had seized the group of approximately 100 persons near the Sheraton Hotel.  Defendant Martinez later testified in the criminal prosecutions of the Plaintiffs and other arrestees that he knew it was possible there were innocent persons who had never marched in the street among the group he was detaining.

64.    Defendant Martinez was right.  The group seized near the Sheraton Hotel included many individuals, such as the Plaintiffs, who had not marched in the street and who were guilty of nothing more than being closer to one side of 15th Street than the other when Denver officers arbitrarily subdivided the large group into two smaller ones.

65.    The fact that the group detained near the Sheraton Hotel included persons who had not been marching in the street was obvious to everyone at the scene, including the Defendants.  Nevertheless, Denver arrested the entire group that was detained next to the Sheraton Hotel.

### B.    Officers Make False Statements in the Affidavits Supporting Plaintiffs' Warrantless Arrests.

66.    The persons arrested in the group near the Sheraton Hotel were "processed" at the site of the arrest, before being taken to the TAPS facility.

11

67.    Each Plaintiff was paired up with an "arresting officer" or officers who completed the arrest paperwork.  The "arresting officer" completed two sworn affidavits -- a written affidavit that was included on the ticket and summons, and an oral affidavit recorded on a handheld video camera.

68.    The statements made by the Plaintiffs' "arresting officers" in these affidavits were universally and materially false.  The "arresting officers" consistently swore that the Plaintiffs were marching in the street; that Defendant Foster audibly ordered them to disperse; and that the Plaintiffs ignored these orders to disperse.

69.    In fact, neither Defendant Foster nor any other officer ever broadcast any dispersal order at any time.  Nor did any of the Plaintiffs participate in the march in the street.

70.    Some officers' false statements went so far as to include invented details regarding the "dispersal order" which was never actually given.  For example, Ms. Bray's "arresting officers" swore that, "At 19:30 hours, Sgt. Foster of Denver PD gave a lawful order to disperse.  [Plaintiff Bray] ignored 3 requests by police to leave.  [Plaintiff Bray] refused, and was then arrested."  Plaintiff Hardy's arresting officer swore that Plaintiff Hardy "was given an order to disperse by Sgt. Foster…The dispersal order was given at 1930 by Sgt. Foster—[Mr. Hardy] didn't comply."  Ms. Masud's "arresting officer" swore that, "[Plaintiff Masud] was in a crowd that was given a dispersal order by Sgt. Foster.  The order was given verbally three times, the crowd refused to disperse. [Plaintiff Masud] was among the crowd at which time a mass arrest was ordered."

71.    Defendant Doe instructed the "arresting officers" to include these false statements in the affidavits, in order to manufacture evidence justifying Plaintiffs' warrantless arrest.  Defendant Doe knew that these statements were false or acted with reckless disregard for the truth of these statements.

## C.    Denial of Right under Colorado Law to Consult with an Attorney.

72.    The Plaintiffs and the others  arrested at 15th and Court, were transported to the TAPS facility, where they were imprisoned.

73.    Colorado Revised Statute ("C.R.S") § 16-3-404 requires that law enforcement officers permit an individual held at any "place of custody" to consult alone and in private with an attorney who arrives at the place of custody to consult with that person.

74.    Shortly after the arrests were made on the night of August 25, 2008, attorneys went to the TAPS facility in order to consult privately with the Plaintiffs and the others arrested with them.  All of the Plaintiffs wished to consult privately with an attorney.

75.     Pursuant to a policy of Defendant Denver, however, DSD employees refused to allow the attorneys access to meet with the Plaintiffs or any of the other persons held at the TAPS facility.

**D.     Plaintiffs are Acquitted or the Charges Against Them are Dismissed.**

76.     The Plaintiffs were initially charged with violating Denver Revised Municipal Code ("DRMC") § 38-31, "Interference with police authority," DRMC § 38-31(c) "Disobedience to a Lawful Order," and DRMC § 38-36, "Obstruction of streets or other public passageways," with the exception of Mr. Acks, who was only charged with the first and third violations above.

77.     After their arrest, Plaintiffs spent up to 25 hours in custody before being released on bond or their own recognizance. After release, all Plaintiffs had to abide by the conditions of their bond, retain attorneys to represent them, and begin preparing to defend themselves against Denver's criminal prosecution.

78.     During the initial criminal prosecutions, the Defendants admitted that no dispersal order was ever given on August 25, 2008. Subsequent to that admission, all charges except DRMC § 38-36, "Obstruction of streets or other public passageways" were dropped.

79.     Before and during the criminal prosecutions, Denver was unable to produce a single piece of evidence or a single witness that implicated any of the individual Plaintiffs in the alleged criminal acts.

80.     The charges against Plaintiff Goll and Plaintiff Morrison were dismissed on October 20, 2008. The charge against Plaintiff Pendergrass was dismissed on October 29, 2008.

81.     On October 22, 2008, the court entered a directed judgment of acquittal in favor of Plaintiff Hardy.

82.     Plaintiff Acks was acquitted by a jury on November 7, 2008. Plaintiffs Bray and Masud were acquitted of all charges by a jury on November 18, 2008. Plaintiff Sidwell was acquitted by a jury of all charges on December 19, 2008.

## VI.  DENVER'S POLICIES, PRACTICES AND CUSTOMS

**A.**    <u>Denver Policymakers are Aware of the Risk of Wrongful Arrests During Mass Arrest Situations</u>.

83.    There is an obvious risk that when law enforcement officers confront a mixed crowd that includes both the innocent and guilty alike, officers will wrongfully arrest persons if they simply arrest *en masse* everyone who is present at the scene.

84.    The risk is particularly obvious in the case of an unpermitted march in city streets, where innocent persons such as members of the media, sidewalk participants, observers, curious onlookers and bystanders may be lawfully present mere feet away from those who are breaking the law by marching without a permit.

85.    Denver was aware of the substantial risk that its officers would wrongfully arrest persons during unpermitted marches if law enforcement officers did not engage some mechanism to distinguish between individuals who were marching in the street and other persons in the immediate vicinity who were not participating in the march.

86.    These risks were obvious to Denver's highest policymakers from past experience.  Denver was aware that unpermitted marches in Denver were frequently attended and observed by the media, lawful sidewalk participants, legal observers, and others.  Denver was aware that if its officers had simply decided to arrest everyone *en masse* in the vicinity of these past marches, the arrests would have certainly swallowed up people who were not breaking the law by marching in the street.

87.    Denver and its highest policymakers were aware of other instances prior to the DNC when the failure to properly distinguish between individuals who were lawfully present and those whom police believed had marched in the streets resulted in the wrongful arrest of innocent participants, observers and bystanders swept up in mass arrests.

**B.**    <u>Denver's Deliberately Indifferent Failure to Adopt Adequate Policies and Training Caused Plaintiffs' Injuries</u>.

88.    Despite this obvious risk, for marches such as the one that prompts this Complaint, Denver did not have meaningful policies or procedures that its officers were required to follow to distinguish between alleged lawbreakers and innocent persons.

89.    Denver knew well in advance of August 25, 2008, that "marches" were planned during the DNC.  Denver knew in particular that an unpermitted street march was planned for the evening of August 25, 2008, and Denver planned and prepared for the event.

90.    Denver knew that if the march occurred as planned, there would be innocent persons in the immediate vicinity of persons marching in the street. Denver knew that unless it required and trained its officers to distinguish between people marching in the street and people who were not marching in the street, there was a significant risk that officers would make wrongful arrests.

91.    Nevertheless, Denver failed to adopt adequate policies or procedures, and failed to adequately train its officers. As a direct result, Defendants did not give a dispersal order or invoke any reliable mechanism to distinguish between people who had been marching in the street, and those who had not, prior to arresting *en masse* the entire group detained near the Sheraton Hotel.

92.    As a direct and foreseeable result of this lack of adequate policies and training, Defendants treated the entire group of individuals detained near the Sheraton Hotel as a homogenous unit. Defendants simply arrested everyone in the group, despite the fact that there was not probable cause to believe that each individual had been violating the law.

## C.    Decisions by Denver's Final Policymaking Officials Caused Plaintiffs' Injuries.

93.    In addition, the decisions of Denver's final policymaking officials made on August 25, 2008, established Denver's municipal policy and caused the violation of the Plaintiffs' constitutional rights.

94.    During the march, Denver's final policymaking officials watched the events unfold remotely and were in communication with officers and supervisors on the scene, including Defendant Dilley.

95.    Denver's final policymakers were aware of the facts alleged in this Complaint.

96.    After Denver's officers had initially seized the group, but before Denver's final policymaking officials ratified and approved the decision to arrest the entire group next to the Sheraton Hotel, there was ample time for consideration, deliberation and review.

97.    Denver's final policymakers ratified and approved the decision of Denver officers to arrest *en masse* the group detained near the Sheraton Hotel.

98.    Denver's final policymaking officials made a deliberate choice among various policy alternatives when deciding what course of action to take with regard to the mixed group seized near the Sheraton Hotel. Those choices included, but were not limited to:

a.    Directing officers to arrest only those persons whom a specific officer actually witnessed marching in the street, and to release the remaining persons;

b.    Directing officers to wait to allow the situation to defuse, and then to release all individuals from the detained group one-by-one without making arrests; and/or

c.    Directing officers to broadcast a dispersal order and open an exit in the police lines, and then arrest individuals who remained in the area after being given an opportunity to leave, in violation of the dispersal order.

99.    Instead, after rejecting various alternatives which would have posed little or no risk of wrongful arrest, Denver's final policymaking officials ratified and authorized the *en masse* arrest of all the individuals detained near the Sheraton Hotel, including the Plaintiffs.

100.    They did so despite the certainty that arresting the entire group would cause the wrongful arrest of persons who had never marched in the street.

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### First and Fourth Amendments, 42 U.S.C.  § 1983
### (Against Defendants Denver, Doe, Dilley, Foster, and Martinez)

101.    Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 100 above as if fully set forth herein.

102.    The First Amendment protects the right of an individual to observe and/or record public events, including the right to record and observe the actions of law enforcement officers.

103.    The right to observe and record law enforcement officers is protected by the First Amendment regardless of whether the individual is a credentialed member of the press, a trained legal observer, an amateur documentarian, or merely a curious onlooker.

104.    Prior to their seizure, the Plaintiffs were all lawfully present in public forums observing the public actions of law enforcement officers.

105.    Once Plaintiffs were detained between police lines and were no longer free to leave, and they had been seized for purposes of the Fourth Amendment.

106.    The Plaintiffs' warrantless arrests were not based upon probable cause to believe that they had violated the law.

107.    Defendants Dilley, Doe, Foster, and Martinez made the decision to arrest the Plaintiffs and caused the violation Plaintiffs' First and Fourth Amendment rights. This decision was ratified and approved, in advance of being effectuated, by Denver's final policymaking officials.

108.    Defendants knew that no dispersal order had been given.    The Defendants knew that there was not probable cause to arrest any individual for refusing to obey a dispersal order which had never been given.  The Defendants knew there was no legitimate basis for instructing "arresting officers" to effectuate warrantless arrests based upon the manufactured evidence recorded in the probable cause affidavits.  The Defendants knew that that not everyone in the group detained near the Sheraton Hotel had been marching in the street.

109.    After the initial seizure of the Plaintiffs but before the decision to arrest them was made, there was ample time for any of the individual Defendants to intervene and prevent the violation of the Plaintiffs' constitutional rights, but they failed to do so.

110.    A reasonable officer in Defendants' position would have known that their actions violated clearly established law.

111.    In causing the arrest of the Plaintiffs, Defendants were acting pursuant to Denver's policies, procedures, customs and practices.

112.    Denver, through its policies, procedures, customs and practices, and through its deliberately indifferent failure to develop adequate policies, procedures and training, caused the violation of the Plaintiffs' constitutional rights.

113.    Plaintiffs are entitled to compensatory and punitive damages from Defendants Dilley, Doe, Foster, and Martinez; compensatory damages from Defendant Denver; attorney's fees pursuant to 42 U.S.C. § 1988 and all applicable law; and any additional relief the Court deems just.

**SECOND CLAIM FOR RELIEF**
**Colorado Law, C.R.S. § 16-3-404**
**By Plaintiffs and Others Similarly Situated Against Defendant Denver**

114.    Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 113 above as if fully set forth herein.

115.    All Plaintiffs and those similarly situated wished to consult with an attorney while they were in Denver's custody at the TAPS facility.

116.    Under Colorado law, all of the Plaintiffs and others similarly situated had the right to consult with an attorney, alone and in private, when an attorney came to meet with them at the TAPS facility.

117.    Defendant Denver denied Plaintiffs and others similarly situated their right to consult with an attorney while Plaintiffs were in Defendants' custody at the TAPS facility.

118.    Defendant Denver is liable to each of the Plaintiffs and others similarly situated for a statutory penalty of up to $1,000, pursuant to C.R.S. § 16-3-404.

WHEREFORE, Plaintiffs and others similarly situated pray for relief as follows:

(a)    compensatory and punitive damages pursuant to 42 U.S.C. § 1983 against Defendants who are sued in their individual capacity;

(b)    compensatory damages from the City and County of Denver;

(c)    statutory penalties from defendants who are sued pursuant to Colorado law;

(d)    an award of Plaintiffs' reasonable attorney's fees and costs of this action, pursuant to 42 U.S.C. § 1988 and any other applicable law; and

(e)    any additional relief the Court deems just and proper.

**PLAINTIFFS AND THE PUTATIVE CLASS DEMAND A JURY TRIAL ON ALL OF THEIR CLAIMS.**

Respectfully submitted this 19th day of August, 2009.

**BENEZRA & CULVER, L.L.C.**

**s/John A. Culver**

John A. Culver, Esq., #21811
Seth J. Benezra, Esq., #13144
274 Union Blvd., #220
Lakewood, CO  80228-1835
(303) 716-0254
jaculver@bc-law.com
   In cooperation with the
   ACLU Foundation of Colorado

ACLU Foundation of Colorado
Mark Silverstein, Esq., #26979
Taylor S. Pendergrass, Esq., #36008
400 Corona Street
Denver, CO  80218
(303) 777-5482
msilver2@att.net

Lonn M. Heymann, Esq., #34793
Rosenthal & Heymann, L.L.C.
1020 W. 7th Avenue
Denver, CO  80204
(303) 825-2223
lonn@rosehey.com
   In cooperation with the
   ACLU Foundation of Colorado

<u>Plaintiff's Address</u>
400 Corona Street
Denver, CO  80218